**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| MONEC HOLDING AG, | ) |
| | ) |
| Plaintiffs, | ) |
| | ) |
| v. | )    Civil Action No. 11-798-LPS-SRF |
| | ) |
| MOTOROLA MOBILITY, INC., | ) |
| SAMSUNG ELECTRONICS AMERICA, | ) |
| INC., SAMSUNG ELECTRONICS, INC., | ) |
| HTC CORP., HTC AMERICA, INC. and | ) |
| EXEDA, INC., | ) |
| | ) |
| Defendants. | ) |

## REPORT AND RECOMMENDATION

### I.   INTRODUCTION

On September 9, 2011, plaintiff Monec Holding AG ("plaintiff" or "Monec") filed suit

against defendants Motorola Mobility LLC, Samsung Electronics America, Inc., Samsung

Electronics Inc.,[1] HTC Corp., HTC America Inc., Exeda Inc., and Samsung Electronics Co., Ltd.

(collectively, "defendants"), alleging infringement of U.S. Patent No. 6,335,678 B1, as

reexamined [2] ("the '678 patent"), entitled "Electronic Device, Preferably An Electronic Book."

(D.I. 1)

The court held a *Markman* hearing on April 30, 2013. This order sets forth the court's

recommendations of constructions for disputed claim terms discussed in the briefing and at the

*Markman* hearing.

---

[1]Samsung Electronics Inc. was included as a defendant in the original complaint, but was
terminated as a defendant on December 19, 2011 with the filing of the first amended complaint.
(D.I. 34)

[2]U.S. Patent No. 6,335,678 C1.

## II.     BACKGROUND OF THE INVENTION

The '678 patent is assigned to Monec and lists Theodor Heutschi as the inventor. The

'678 patent originally issued on January 1, 2002 with thirteen claims. On November 11, 2009,

non-party Apple Inc. ("Apple") filed a request for ex parte reexamination as to all claims.

Following ex parte reexamination, the United States Patent and Trademark Office ("PTO")

issued a reexamination certificate on May 10, 2011, modifying the language of claim 1 and

adding new claims 14-28.

The '678 patent describes a touch-screen electronic reading device that can exchange

information with at least one other device via a multiband station. ('678 patent, col. 5:65 - 6:10)

The specification states that the electronic device has "a very light and easily portable

construction, can be used very universally and at the same time has a relatively large display."

('678 patent, col. 1:43-46) The '678 patent allows for internet access, email retrieval, video

conferencing, navigation, downloads, and book procurement. (*Id.*, col. 2:35-42) The

specification describes the components of the electronic book to include "a housing, a display, an

electronic circuit, a memory, a receiver for data from the system, input means and a power

source, which can be charged for example by means of solar cells or thermo-electric generators."

(*Id.* at col. 2:13-17)

On March 23, 2009, Monec sued Apple for infringement of the '678 patent in the Eastern

District of Virginia. On July 17, 2009, the court held oral argument and granted summary

judgment of non-infringement as to all claims, holding that the accused iPhone devices did not

infringe the '678 patent because they included a display that was too small to show one page of a

book at a normal size. (D.I. 127, Ex. B, Ex. F at 19:2-22, 7:9-8:3) The court denied Monec's

2

motion for reconsideration, and Monec appealed the summary judgment ruling to the Federal Circuit. (D.I. 139, Ex. C at 3:17-19)  The parties settled shortly thereafter, including a provision in the dismissal order to vacate the court's summary judgment order. (D.I. 127, Ex. D)

## III.   LEGAL STANDARD

"It is a bedrock principle of patent law that the claims of a patent define the invention to which the patentee is entitled the right to exclude." *Phillips v. AWH Corp.*, 415 F.3d 1303, 1312 (Fed. Cir. 2005) (internal quotation marks omitted).  Construing the claims of a patent presents a question of law. *See Markman v. Westview Instruments, Inc.*, 52 F.3d 967, 977-78 (Fed. Cir. 1995), *aff'd*, 517 U.S. 370, 388-90 (1996).  "[T]here is no magic formula or catechism for conducting claim construction." *Phillips*, 415 F.3d at 1324.  Instead, the court is free to attach the appropriate weight to appropriate sources "in light of the statutes and policies that inform patent law." *Id.*

"[T]he words of a claim are generally given their ordinary and customary meaning . . . [which is] the meaning that the term would have to a person of ordinary skill in the art in question at the time of the invention, i.e., as of the effective filing date of the patent application." *Id.* at 1312-13 (internal citations and quotation marks omitted).  "[T]he ordinary meaning of a claim term is its meaning to the ordinary artisan after reading the entire patent." *Id.* at 1321 (internal quotation marks omitted).  The patent specification "is always highly relevant to the claim construction analysis.  Usually, it is dispositive; it is the single best guide to the meaning of a disputed term." *Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576, 1582 (Fed. Cir. 1996).

While "the claims themselves provide substantial guidance as to the meaning of particular claim terms," the context of the surrounding words of the claim also must be considered.

3

*Phillips*, 415 F.3d at 1314. Furthermore, "[o]ther claims of the patent in question, both asserted and unasserted, can also be valuable sources of enlightenment . . . [b]ecause claim terms are normally used consistently throughout the patent . . . ." *Id.* (internal citation omitted).

It is likewise true that "[d]ifferences among claims can also be a useful guide . . . For example, the presence of a dependent claim that adds a particular limitation gives rise to a presumption that the limitation in question is not present in the independent claim." *Id.* at 1314-15 (internal citation omitted). This "presumption is especially strong when the limitation in dispute is the only meaningful difference between an independent and dependent claim, and one party is urging that the limitation in the dependent claim should be read into the independent claim." *SunRace Roots Enter. Co., Ltd. v. SRAM Corp.*, 336 F.3d 1298, 1303 (Fed. Cir. 2003).

It is also possible that "the specification may reveal a special definition given to a claim term by the patentee that differs from the meaning it would otherwise possess. In such cases, the inventor's lexicography governs." *Phillips*, 415 F.3d at 1316. It bears emphasis that "[e]ven when the specification describes only a single embodiment, the claims of the patent will not be read restrictively unless the patentee has demonstrated a clear intention to limit the claim scope using words or expressions of manifest exclusion or restriction." *Liebel-Flarsheim Co. v. Medrad, Inc.*, 358 F.3d 898, 906 (Fed. Cir. 2004) (internal quotation marks omitted), *aff'd*, 481 F.3d 1371 (Fed. Cir. 2007).

In addition to the specification, a court "should also consider the patent's prosecution history, if it is in evidence." *Markman*, 52 F.3d at 980. The prosecution history, which is "intrinsic evidence," "consists of the complete record of the proceedings before the PTO [Patent and Trademark Office] and includes the prior art cited during the examination of the patent."

4

*Phillips*, 415 F.3d at 1317. "[T]he prosecution history can often inform the meaning of the claim language by demonstrating how the inventor understood the invention and whether the inventor limited the invention in the course of prosecution, making the claim scope narrower than it would otherwise be." *Id.*

A court also may rely on "extrinsic evidence," which "consists of all evidence external to the patent and prosecution history, including expert and inventor testimony, dictionaries, and learned treatises." *Markman*, 52 F.3d at 980. For instance, technical dictionaries can assist the court in determining the meaning of a term to those of skill in the relevant art because such dictionaries "endeavor to collect the accepted meanings of terms used in various fields of science and technology." *Phillips*, 415 F.3d at 1318. In addition, expert testimony can be useful "to ensure that the court's understanding of the technical aspects of the patent is consistent with that of a person of ordinary skill in the art, or to establish that a particular term in the patent or the prior art has a particular meaning in the pertinent field." *Id.* Nonetheless, courts must not lose sight of the fact that "expert reports and testimony [are] generated at the time of and for the purpose of litigation and thus can suffer from bias that is not present in intrinsic evidence." *Id.* ("[C]onclusory, unsupported assertions by experts as to the definition of a claim term are not useful to a court.") Overall, while extrinsic evidence "may be useful" to the court, it is "less reliable" than intrinsic evidence, and its consideration "is unlikely to result in a reliable interpretation of patent claim scope unless considered in the context of the intrinsic evidence." *Id.* at 1318-19.

Finally, "[t]he construction that stays true to the claim language and most naturally aligns with the patent's description of the invention will be, in the end, the correct construction."

5

*Renishaw PLC v. Marposs Societa' Per Azioni*, 158 F.3d 1243, 1250 (Fed. Cir. 1998). It follows

that "a claim interpretation that would exclude the inventor's device is rarely the correct

interpretation." *Osram GmbH v. Int'l Trade Comm'n*, 505 F.3d 1351, 1358 (Fed. Cir. 2007).

## IV.   CONSTRUCTION OF DISPUTED TERMS

   **A.**   **"said display has dimensions such that one page of a book can be displayed at a normal size" ('678 patent, claim 1)**

      **1.**   *Monec's proposed construction*: **"Plain meaning, or the dimensions of the display are such that data representing one page of a book can be displayed at a normal size."**

      **2.**   *Defendants' proposed construction*: **"said display has the dimensions of a page of a conventionally sized hardback or paperback book."[3]**

      **3.**   *Court's construction*: **"said display has the dimensions of a page of a conventionally sized hardback or paperback book."**

I recommend that the court construe the claim term as follows: "said display has the

dimensions of a page of a conventionally sized hardback or paperback book." This construction

is consistent with the claim language and the specification. The claim language requires that the

display have dimensions, and that those dimensions correspond with "one page of a book" at a

"normal size." ('678 patent at col. 6:43-44) The specification indicates that the phrase "page of

a book" refers to a physical book. The abstract provides that "[t]he display . . . has dimensions

such that with it approximately one page of a book can be illustrated at normal size." (*Id.* at

Abstract) The recommended construction clarifies that the dimensions of the display correspond

---

[3]During the *Markman* hearing, the defendants submitted that the "normal size" language of claim 1 is indefinite. (4/30/13 Tr. at 38:7-19) While "[i]ndefiniteness is a matter of claim construction," *Praxair, Inc. v. ATMI, Inc.*, 543 F.3d 1306, 1319 (Fed. Cir. 2008), and presents a question of law, *see ePlus, Inc. v. Lawson Software, Inc.*, 700 F.3d 509, 517 (Fed. Cir. 2012), the court declines to make a determination as to indefiniteness at this stage in the proceedings.

with the size of a conventional book page.

      The defendants note that the specification also refers to the device's "relatively large display." ('678 patent at Abstract; col. 1:43-46; col. 5:55-59) However, these references fail to provide additional guidance regarding the parameters of the display's size because they do not draw a comparison to a conventionally-sized book as the defendants suggest. Rather, the language in the specification referencing the relatively large display appears in the context of the device's light and easily portable construction. (*Id.*) This suggests that the display is large relative to the size of the device as a whole. As a result, the "relatively large display" language from the specification does not bolster either party's proposed construction.

      The defendants cite the Eastern District of Virginia's decision construing the same claim language in the *Monec v. Apple* litigation in accordance with their proposed construction in the present matter. A prior claim construction has no binding or preclusive effect in this court, particularly where, as here, the defendants were not parties to the earlier action. *See Jackson v. Vtech Telecomm'cns Ltd.*, 2003 WL 25815373, at *3 (N.D. Ill. 2003) (citing *Allen Archery, Inc. v. Browning Mfg. Co.*, 819 F.2d 1087, 1091 (Fed. Cir. 1987)). Although a prior opinion on claim construction may be consulted as persuasive authority, the persuasiveness of the Eastern District of Virginia's decision is limited in the present matter because the court acknowledged that it did not conduct a full *Markman* hearing or issue a written decision (D.I. 139, Ex. C at 4:10-23), and the court subsequently agreed to vacate its decision (*Id.* at 5:17 - 6:1).

      The defendants also refer to a brochure contained in the prosecution history, which describes the Voyager as having a 10.4 inch display measured diagonally. (D.I. 121, Ex. 2 at M624) The defendants characterize these dimensions as comparable to the dimensions of a

7

conventionally-sized book, although the brochure itself appears to make no such comparison.[4]
(*Id.*; D.I. 126 at 8)  Even if the brochure drew an express comparison between the Voyager and a
conventional book, the Voyager represents only one embodiment of the patent, and the language
of claim 1 does not limit the size of the display to a specific set of dimensions.

Monec's proposed construction is not supported by the claim language or the
specification.  Monec unsuccessfully attempts to divorce the word "page" from the subsequent
modifying prepositional phrase "of a book" in the claim language.  (D.I. 125 at 10)  In support of
its argument, Monec cites dictionary definitions, expert opinion, and other extrinsic evidence[5] to
define "page" as a "screenful of information from a website."  (*Id.*)  Such an interpretation, when
read in conjunction with the subsequent phrase "of a book," would not assist the jury in
understanding the meaning of the claim language.  *See Power-One, Inc. v. Artesyn Techs., Inc.*,
599 F.3d 1343, 1348 (Fed. Cir. 2010) ("The terms, as construed by the court, must ensure that the
jury fully understands the court's claim construction rulings and what the patentee covered by the
claims.").  The court cannot conclude that the word "page" refers to a web page in the context of
the '678 patent when the specification and claim language refer to the phrases "book page" and
"page of a book," respectively.  ('678 patent at col. 1:47-49, 6:43-44)

Monec also contends that "normal size" has a specific definition in the computer science

---

[4]The copy of the brochure included in the Appendix is difficult to read.  However, counsel
did not indicate that the brochure made a direct comparison between the size of the device's display
and the size of a typical book.

[5]Monec notes that the defendants own 1,850 patents wherein the word "page" is used by the
defendants to signify a web page.  (D.I. 138 at 4-5 n.8)  However, Monec does not indicate that any
of the defendants' patents use the word "page" in a context in which it is modified by the
prepositional phrase "of a book."

8

field, meaning that the display is large enough to show a readable block of text. (D.I. 125 at 9-10; 4/30/13 Tr. at 22:3-20, 29:13-21) However, nothing in the intrinsic record supports Monec's allegations of readability.[6] Monec's arguments regarding the impracticability of displaying a newspaper at full size are likewise unsupported by the intrinsic record. (4/30/13 Tr. at 26:1-6) The disputed claim language refers only to a book, and not to a magazine or newspaper. The specification indicates that conventional reading mediums such as books, newspapers, and magazines, can be displayed on the device, but does not require the display size to be large enough to accommodate a normal-sized newspaper page. ('678 patent at col. 2:48-50) The claim language defines the dimensions of the display only in terms of the normal size of a conventional book. ('678 patent at col. 2:48-50, 6:43-44)

    **B.**     **"said housing is unitary flat and frame shape and is provided with said display and said video camera integrated therein" ('678 patent, claim 1)**

        **1.**     *Monec's proposed construction*: **"Plain meaning or housing of the components is unitary flat, and frame shaped, the display and video camera being integrated with the housing."**

        **2.**     *Defendants' proposed construction*: **"said housing is flat, frames the display and video camera integrated therein, and is formed as a single component, such that the housing is not able to be disassembled and reassembled by the user."**

        **3.**     *Court's construction*: **"housing of the components is unitary, flat, and frame shaped, the display and video camera being integrated with the housing."**

The disputed word "unitary" was added as an amendment to overcome a rejection during

---

[6]Monec's reliance on the declaration of Dr. Stubblebine is insufficient to overcome the persuasive intrinsic record regarding this claim term. *See Kara Tech. Inc. v. Stamps.com Inc.*, 582 F.3d 1341, 1348 (Fed. Cir. 2009) ("While helpful, extrinsic sources like expert testimony cannot overcome more persuasive intrinsic evidence.").

9

the original prosecution of the '678 patent in 2001. (D.I. 122, Ex. 10 at M604) Neither the specification nor the claim language defines the word "unitary." The court must therefore consult the prosecution history to determine the proper construction of this term. The examiner initially rejected the patent as anticipated by U.S. Patent No. 5,983,073 ("Ditzik") under 35 U.S.C. § 102. (*Id.*) The applicant overcame the rejection by adding the term "unitary" to distinguish the invention from Ditzik. (*Id.*)

Monec alleges that the addition of the term "unitary" overcomes Ditzik by illustrating that the '678 patent is not composed of two articulated components. (D.I. 138 at 6; 4/30/13 Tr. at 59:9-22) The defendants allege that Ditzik discloses an electronic device with a non-unitary housing that includes detachable pieces such as the battery. (D.I. 126 at 10-11) According to the defendants, the specification of the '678 patent does not disclose any capability of removing or replacing components of the housing, and this characteristic was the basis of the examiner's ultimate allowance of the '678 patent over Ditzik. (*Id.* at 11)

The recommended construction is consistent with the '678 patent specification, which distinguishes the '678 patent from the prior art by indicating that it displays only one book page at a time as opposed to the more conventional two page display. ('678 patent at col. 1:29-51) Figure 10 depicts the device as a single tablet, with no hinges or covers attached. ('678 patent at Fig. 10; col. 5:13-19) No embodiment of the '678 patent describes a device that folds shut or otherwise exhibits a hinge dividing the housing.

The recommended construction is also consistent with the prosecution history. By adding the word "unitary" to describe the single-panel housing of the '678 patent, the patentee overcame Ditzik, which describes a "notebook computer" comprising "a first half panel structure having a

10

flat panel display device and control electronics" and "a second half panel structure physically connected to the first half panel via a hinge means." (D.I. 121, Ex. 5 at col. 15:8-14) The preferred embodiments of Ditzik describe an expandable hinge means connecting a cover assembly, which may consist of a keyboard section and a battery power unit, to a flat panel display assembly. (*Id.* at col. 3:60-4:1; col. 5:33-47; col. 10:11-19) Ditzik repeatedly distinguishes the prior art for its failure to teach an expandable hinge means or a cover latching function (*Id.* at col. 1:40-63), and claims to solve the problems of the prior art "by embodying a unique relatively thin notebook-like computer system that is capable of being: (1) opened like a notebook . . ." (*Id.* at col. 2:10-12). Unlike Ditzik, the housing described in the '678 patent is not divided by a hinge.

The dictionary definition of "unitary" as "having the character of a unit: not divided or discontinuous" also supports the recommended construction. (D.I. 127, Ex. H)

The defendants allege that the patentee overcame Ditzik by adding the word "unitary" because the '678 patent has integrated components, such as the battery, that prevent the housing from being disassembled and re-assembled. (D.I. 126 at 10-11) This argument is not supported by the intrinsic evidence. The disputed claim term specifically uses the word "integrated" to indicate that the display and video camera are integrated within the housing, but fails to identify the battery or power source as an integrated component. ('678 patent, reexamined claim 1, col. 1:35-37) The court cannot properly read the integrated battery limitation from the specification into the claim language when the patentee expressly characterized the display and the video camera as integrated components in the claim language, but did not include the power source in that limitation. *See Phillips*, 415 F.3d at 1327 ("It is a 'bedrock principle' of patent law that 'the

11

claims of a patent define the invention to which the patentee is entitled the right to exclude.'"");

*Bicon, Inc. v. Straumann Co.*, 441 F.3d 945, 950 (Fed. Cir. 2006) ("claims are interpreted with an

eye toward giving effect to all terms in the claim."); *see also Enzo Biochem, Inc. v. Applera*

*Corp.*, 599 F.3d 1325, 1342 (Fed. Cir. 2010) ("[I]t is improper to read limitations from a

preferred embodiment described in the specification – even if it is the only embodiment – into

the claims absent a clear indication in the intrinsic record that the patentee intended the claims to

be so limited.").

Moreover, "[c]ourts must generally take care to avoid reading process limitations into an

apparatus claim because the process by which a product is made is irrelevant to the question of

whether that product infringes a pure apparatus claim." *Baldwin Graphic Sys., Inc. v. Siebert,*

*Inc.*, 512 F.3d 1338, 1344 (Fed. Cir. 2008) (internal citation omitted). The prosecution history

contains no express and unequivocal disavowal regarding the '678 patent's ability to be

disassembled and reassembled. The claim language and specification of the '678 patent are also

silent as to whether the device may be disassembled. For these reasons, the court cannot properly

construe the claim term such that the housing is not able to be disassembled and reassembled by

the user. *See Omega Eng'g*, 334 F.3d at 1325-26.

C. **"receiving module operable to receive a GSM chip or a[n] SIM chip" ('678**
   **patent, claim 1)**

   1. *Monec's proposed construction:* **"Plain meaning or receiving module**
      **capable of docking a GSM and/or SIM chip."**

   2. *Defendants' proposed construction:* **"receptacle that allows for**
      **insertion and removal of a GSM chip or SIM chip by the user."**

   3. *Court's construction:* **Plain meaning.**

12

According to Monec, the defendants' proposed construction must fail because neither the claim language nor the specification requires that the receiving module must allow a user to both insert and remove the GSM chip or SIM chip, and there is no express and unequivocal disavowal in the prosecution history to that effect. (D.I. 125 at 12) The defendants contend that the written description and prosecution history support their proposed construction because the applicant specified during reexamination that "the user of the device is provided the opportunity to move the GSM or SIM card to other GSM/SIM ready devices." (D.I. 126 at 12) According to the defendants, Monec's construction is unsupported by the intrinsic record because the word "docking" does not appear anywhere in the written description, it is vague, and it provides no additional guidance. (*Id.* at 13)

Consistent with the claim language and the specification, I recommend the adoption of the plain language of the claim term as proposed by Monec. The parties agree that the claim language supports a construction in which the GSM chip or SIM chip can be both inserted into and removed from the receiving module. (4/30/13 Tr. at 77:6-12, 77:23-78:2) Instead, the parties' dispute centers on whether the receiving module allows **the user** to move the GSM chip or SIM chip.

Both the claim language and the specification are silent regarding whether the receiving module allows a user to insert and/or remove the GSM chip or SIM chip. The defendants allege that the "by the user" limitation is implied from a portion of the specification stating that, "[i]f the data are copied onto a foreign device, they can neither be opened nor read without the associated GSM chip card (SIM card)." (D.I. 126 at 12 (citing'678 patent, col. 3:4-9)) However, this language does not expressly indicate that a user must move the GSM or SIM card to and

13

from the device, and falls short of suggesting that "the very character of the invention requires the limitation be a part of every embodiment." *Alloc, Inc. v. Int'l Trade Comm'n*, 342 F.3d 1361, 1370 (Fed. Cir. 2003); *see also MEMS Tech. Berhad v. Int'l Trade Comm'n*, 447 F. App'x 142, 151 (Fed. Cir. 2011) (concluding that a claim need not be limited to a scope commensurate with the abstract or summary sections of the specification).

Moreover, when the relevant portion of the specification is read in conjunction with the claims, it is apparent that the excerpt from the specification does not represent all embodiments of the invention. Claim 17, which depends from claim 1, adds the limitation "[a]n electronic device as claimed in claim 1 wherein the device can only be read with the GSM chip or SIM card associated with the device at the time of downloading the book data." ('678 patent at claim 17) The concept described in dependent claim 17 mirrors the language cited by the defendants from the specification, indicating that the relevant portion of the specification describes only one embodiment of the invention, and any inherent characteristics of that particular embodiment are not necessarily present in all embodiments of the invention. *See SunRace Roots Enter. Co., Ltd. v. SRAM Corp.*, 336 F.3d 1298, 1302-03 (Fed. Cir. 2003) (holding that a limitation from a dependent claim should not be read into an independent claim, especially "when the limitation in dispute is the only meaningful difference between an independent and dependent claim.").

Likewise, the prosecution history does not sufficiently support the defendants' proposed construction. The relevant portion of the prosecution history identifies the "incorporat[ion of] the videostream into a multiband station having GSM or SIM capability" as a distinguishing feature of the invention over the prior art. (D.I. 122, Ex. 13 at M56) In describing this feature, the prosecution history indicates that one of its "numerous advantages" is that "**the user of the**

14

.

**device** is provided the opportunity to move the GSM or SIM card to other GSM/SIM card ready devices." (*Id.*) (emphasis added). Nothing in this excerpt amounts to an unambiguous disavowal of the scope of the disputed claim term. *See Purdue Pharma L.P. v. Endo Pharms. Inc.*, 438 F.3d 1123, 1136 (Fed. Cir. 2006) ("Under the doctrine of prosecution disclaimer, a patentee may limit the meaning of a claim term by making clear and unmistakable disavowal of scope during prosecution."). Read in context, the prosecution history does not suggest that the "user of the device" language was pivotal to the examiner's determination that the amendments were sufficient to overcome Ditzik. *See Omega Eng'g*, 334 F.3d at 1325-26 (requiring defendants to show a "clear and unmistakable" disavowal in the prosecution history).

Monec's proposed "receiving module capable of docking a GSM and/or SIM chip" likewise lacks sufficient support in the intrinsic record. At oral argument, Monec conceded that the "and/or" language in its proposed construction is not supported by the claim language or the specification. (4/30/13 Tr. at 72:17-21; 77:13-15) Moreover, the word "docking" is not supported by the intrinsic evidence. (*Id.* at 76:22-77:12)

    **D.**     **"PIN code" (amendment to claim 1 of reexamined '678 patent)**

        **1.**     *Monec's proposed construction*: **"An identifying code found on the GSM chip or SIM chip."**

        **2.**     *Defendants' proposed construction*: **"unique code entered by the user that identifies the electronic device."**

        **3.**     *Court's construction*: **"An identifying code found on the GSM chip or SIM chip."**

According to Monec, the defendants' proposed construction improperly imports limitations from the specification and the prosecution history that the code must be entered by the

user, must be unique, and must identify the electronic device. (D.I. 125 at 13) Monec explains

that the PIN on a SIM chip or GSM chip can be preset and may never be known to the user. (*Id.*)

Monec further alleges that the specification references more than one embodiment and more than

one type of PIN code which may or may not be unique. (D.I. 138 at 7-8)

The defendants allege that their proposed construction is supported by the specification

and the reexamination history. (D.I. 126 at 13-15) According to the defendants, the specification

describes the functions of the PIN code to include financial accounting and prohibiting the

copying of downloaded materials, both of which would require entry of the PIN code by the user.

(*Id.* at 14-15) Moreover, the defendants contend that Monec confirmed the necessity of the

"unique" and "identifies the electronic device" limitations during the reexamination proceedings.

(*Id.* at 15; D.I. 137 at 9)

Nothing in the claim language or specification describes the PIN code as "unique." The

only intrinsic evidence cited by the defendants in support of this limitation is found in the

prosecution history, which states that "the user of the device is provided the opportunity to move

the GSM or SIM card to other GSM/SIM card ready devices . . . and still have the data stream

transmitted accounted by its exchange against any data exchange limitations associated with its

account due to the **unique** PIN code." (D.I. 122, Ex. 13 at M56) (emphasis added). For the

reasons previously stated in connection with the court's analysis of the "receiving module" claim

term, this evidence is insufficient to constitute prosecution history disclaimer. *See* § IV.C, *supra*.

The defendants' proposed "entered by the user" limitation is likewise unsupported by the

intrinsic evidence. The specification identifies the functions of the PIN code as including

financial accounting and the prevention of copying downloaded materials. Even if the court were

16

to infer that user entry is an inherent characteristic of these two functions, the intrinsic evidence
does not support a construction that would limit the invention to these embodiments. *See
Dealertrack, Inc. v. Huber*, 674 F.3d 1315, 1327 (Fed. Cir. 2012) ("As a general rule, it is
improper to read limitations from a preferred embodiment described in the specification – even if
it is the only embodiment – into the claims absent a clear indication in the intrinsic record that
the patentee intended the claims to be so limited.") (internal quotations omitted). Specifically,
dependent claims 14 and 17 describe the two functions of the PIN code set forth in the
specification. By not including these functions in the language of independent claim 1, the
patentee evidenced an intent not to limit the independent claim to those embodiments. *See
SunRace Roots Enter. Co., Ltd. v. SRAM Corp.*, 336 F.3d 1298, 1302-03 (Fed. Cir. 2003)
(holding that a limitation from a dependent claim should not be read into an independent claim,
especially "when the limitation in dispute is the only meaningful difference between an
independent and dependent claim.").

The court also declines to construe the term "PIN code" in a manner that limits its
purpose to identification of the electronic device because such a limitation does not find
sufficient support in the intrinsic evidence. The defendants concede that the specification
provides no support for the proposed limitation, instead relying solely on the prosecution history.
(4/30/13 Tr. at 100:5-14)

The relevant portion of the prosecution history states that "[t]he PIN code allows for
exacting identification of the device which is receiving the information, such as the book, or
magazine or newspaper data, allowing one to know who the information is being distributed to . .
." (D.I. 122, Ex. 9 at M104) However, this statement is ambiguous to the extent that the phrase

17

"allowing one to know who the information is being distributed to" suggests that the PIN code identifies the user, and not the device. The ambiguity of the "exacting identification of the device" language is further heightened by the specification, which provides that the GSM chip or SIM chip containing the PIN code may be moved to another device. ('678 patent at col. 3:4-9) Absent a "clear and unmistakable" disavowal, the court will not limit the claim based on statements made in the prosecution history. *Omega Eng'g, Inc.*, 334 F.3d at 1325-26; *see also Phillips*, 415 F.3d at 1317 ("Yet because the prosecution history represents an ongoing negotiation between the PTO and the applicant, rather than the final product of that negotiation, it often lacks the clarity of the specification and thus is less useful for claim construction purposes.").

## V.    CONCLUSION

For the reasons set forth above, I recommend the disputed terms be construed as follows:

| Claim Term | Recommended Construction |
|---|---|
| "Said display has dimensions such that one page of a book can be displayed at a normal size" ('678 patent, claim 1) | "Said display has the dimensions of a page of a conventionally sized hardback or paperback book." |
| "Said housing is unitary flat and frame shape and is provided with said display and said video camera integrated therein" ('678 patent, claim 1) | "Housing of the components is unitary, flat, and frame shaped, the display and video camera being integrated with the housing." |
| "Receiving module operable to receive a GSM chip or a[n] SIM chip" ('678 patent, claim 1) | Plain meaning. |
| "PIN code" ('678 patent, claim 1) | "An identifying code found on the GSM chip or SIM chip." |

18

This Report and Recommendation is filed pursuant to 28 U.S.C. § 636(b)(1)(B), Fed. R. Civ. P. 72(b)(1), and D. Del. LR 72.1.  The parties may serve and file specific written objections within fourteen (14) days after being served with a copy of this Report and Recommendation. Fed. R. Civ. P. 72(b).  The failure of a party to object to legal conclusions may result in the loss of the right to de novo review in the district court.  *See Henderson v. Carlson*, 812 F.2d 874, 878-79 (3d Cir. 1987); *Sincavage v. Barnhart*, 171 F. App'x 924, 925 n.1 (3d Cir. 2006).  The objections and responses to the objections are limited to ten (10) pages each.

The parties are directed to the court's Standing Order In Non Pro Se Matters For Objections Filed Under Fed. R. Civ. P. 72, dated November 16, 2009, a copy of which is available on the court's website, www.ded.uscourts.gov.

Because this Report & Recommendation may contain confidential information, it has been released under seal, pending review by the parties to allow them to submit a single, jointly proposed, redacted version (if necessary) of the Report & Recommendation.  Any such redacted version shall be submitted no later than June 18, 2013 for review by the court.  The court will subsequently issue a publicly-available version of its Report & Recommendation.

Dated: June 11, 2013

Sherry R. Fallon
UNITED STATES MAGISTRATE JUDGE

19